**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANNE LEWIS, et al.,

      Plaintiffs,

    v.

CITY OF HAYWARD, et al.,

      Defendants.

_____/

No. C 03-5360 CW

ORDER GRANTING IN
PART AND DENYING
IN PART
DEFENDANTS'
MOTIONS FOR
SUMMARY JUDGMENT
AND TO EXCLUDE
EXPERT TESTIMONY

    Defendants Officer Rob Farro, Officer A. Nguyen, Officer E. Mulhern, Officer C. Martinez, Officer E. Hutchinson, Officer J. Waybright, Officer R. Sappington, Officer D. Olson,[1] Officer J. Bryan (collectively referred to as "the officers") and Sergeant R. Keener, Chief Craig Calhoun of the Hayward Police Department (HPD) and the City of Hayward move pursuant to Federal Rule of Civil Procedure 56 for summary judgment in their favor of the claims against them.  Defendants also move to exclude certain expert testimony.  Plaintiffs Annie Lewis, Demario Lewis, Delorenzo Lewis and Deandre Lewis oppose the motions.  The matters were heard on January 6, 2005.  At the request of the Court, the parties filed supplemental briefing on the issue of damages.  Having considered

---

[1]Defendants explain that Defendant D. Olsen is erroneously sued as "D. Olson."

1  all of the papers filed by the parties and oral argument on the

2  motions, the Court grants them in part and denies them in part, as

3  described below.

BACKGROUND

4  I.  Events of November 28, 2002

5

6      This lawsuit arises out of an incident involving police

7  officers and decedent Gregory Lewis early in the morning of

8  November 28, 2002, in Hayward, California.  Plaintiff Annie Lewis

9  is Mr. Lewis' mother, and Plaintiffs Demario, Delorenzo and Deandre

10  Lewis are Mr. Lewis' children.

11      According to Officer Farro, the first officer to arrive at the

12  scene at approximately 5:00 a.m., he was called for a "welfare

13  check,"[2] based on the report of a disoriented male wearing only

14  boxer shorts yelling outside of a Motel 6.  Hom Decl., Ex. A, Farro

15  Dep. 20-21.  Officer Farro believed that the individual, later

16  identified as Mr. Lewis, was possibly under the influence of PCP,

17  based on Mr. Lewis' rigid walking, lack of awareness of his

18  surroundings and failure to respond to Officer Farro's attempts to

19  speak with him.  Id. 24, 27.  Officer Farro describes Mr. Lewis'

20  behavior as "bizarre," including yelling unintelligibly, jumping in

21  place and staring at the wall.  Id. 25.  Mr. Lewis seemed

22  unaffected by the cold air, despite his lack of clothing.  Id. 35.

23  However, nothing in this behavior led Officer Farro to believe that

24  Mr. Lewis was in need of medical help.  Id. 36.

25

26      [2]A "welfare check" is a police procedure for checking on an
   individual's safety to determine if he or she needs help.  Farro
27  Dep. 37.

28
                              2

United States District Court

For the Northern District of California

Officer Nguyen was called next to assist.  He also quickly formed the opinion that Mr. Lewis was under the influence of PCP. Hom Decl., Ex. B, Nguyen Dep. 28.  He and Officer Farro initially asked Mr. Lewis to come closer to them, but Mr. Lewis did not respond.  Id. 30.

At some point, people came out of their rooms in the Motel 6 to observe.  Farro Dep. 30.  Ms. Garcia identified herself to Officers Farro and Nguyen as Mr. Lewis' girlfriend, and gave them Mr. Lewis' wallet.  Id. 31, Nguyen Dep. 24.  Officer Nguyen ran a warrant check on Mr. Lewis, but does not remember whether Mr. Lewis had any criminal history.  Id. 25.  Ms. Garcia told Officer Farro that she was afraid of Mr. Lewis.  Farro Dep. 59.  She told Officer Nguyen that she and Mr. Lewis had been drinking, but did not mention any use of drugs.  Nguyen Dep. 27.

Officer Farro asked for additional units to assist him and Officer Nguyen in contacting Mr. Lewis.  Farro Dep. 34.  When there were at least four to five officers present, Officer Farro declares, Mr. Lewis threatened, "It's on," "clenched his fist in a fighting stance" and aggressively "charged" toward the officers from about ten feet away.  Id. 39, 43.  Officer Nguyen also testified that Mr. Lewis charged at them, and reported using his pepper spray.  Nguyen Dep. 31.  Mr. Lewis seemed to have a problem with depth perception as he walked towards them; he "would seem to fall forward until his foot [hit] the ground."  Hom Decl., Ex. C, Olsen Dep. 25.  Officer Farro and Officer Martinez sprayed Mr. Lewis with pepper spray, which stopped him, but didn't otherwise have much effect.  Farro Dep. 40, 44, 46.  Seeing at least two

United States District Court

For the Northern District of California

officers already wielding pepper spray, Officer Olsen took out his baton, in preparation to use force in case Mr. Lewis failed to comply with the officers' orders to lie on the ground.  Olsen Dep. 26-27.  When Officer Nguyen saw how little effect the pepper spray had, he also took out his baton, in order both to gain compliance and to defend himself.  Nguyen Dep. 37, 38.  Officer Nguyen struck Mr. Lewis twice on the arm with his baton.  Id. 38.

Officer Farro tried to grab Mr. Lewis, as did the other officers, to pull him down to the ground, but Mr. Lewis threw him off.  Farro Dep. 44-48.  Officer Farro wanted to check his pulse and determine the extent of his drug influence.  Id. 48.  Officer Nguyen says that his plan was to gain control of Mr. Lewis so that they could see if he needed medical attention, check that he was indeed under the influence and prevent him from harming himself or the police.  Nguyen Dep. 39.

The interaction quickly resulted in what Officer Farro describes as a "very violent struggle," in which Mr. Lewis threw off several officers, kicked violently and dragged the officers into a landscaped rock area near a staircase outside the motel.  Farro Dep. 54, 57.  Officer Farro used his baton and kept telling Mr. Lewis to stop resisting and get down on the ground.  Id. 55.  Officer Farro recalls striking Mr. Lewis on the right arm twice with his baton, in hopes of overcoming Mr. Lewis' resistence, but says that Mr. Lewis exhibited a "superhuman strength" characteristic of PCP users, "flinging off officers" and breaking out of a figure-four leg lock.  Id. 57, 58.  Officer Olsen says that he was hit by Mr. Lewis, who struck out with his arms at all

4

of the officers.  Olsen Dep. 35.  Mr. Lewis pushed Officer Farro into the stairwell, where the officer hit his head.  Farro Dep. 64. While on the ground, Mr. Lewis pushed off three officers, and attempted to get up by grabbing the railing of the nearby stairwell.  Id. 58, 61.  Officer Olsen struck Mr. Lewis with a baton on his upper left shoulder, and then two to three more times on the left forearm, but it had no effect.  Olsen Dep. 37.  Officer Olsen remembers Mr. Lewis going down into an almost seated position, but is not sure how that happened.  Id. 39.  Officer Hutchinson pulled him back down by the feet, causing Mr. Lewis to fall face down on the ground.  Farro Dep. 62.  According to Officer Olsen, Officer Hutchinson tried to roll Mr. Lewis into a stomach-down, prone position, which took twenty to thirty seconds.  Olsen Dep. 39, 41.  At least five officers tried to subdue and handcuff Mr. Lewis by getting control of his arms and legs, but he was very hard to control.  Farro Dep. 66-67.  Officers Farro and Olsen observed Mr. Lewis slamming his own head into the rock-covered ground in an effort to get up.  Id. 70; Olsen Dep. 42.  Officer Martinez placed his foot on Mr. Lewis' lower back for about three to five seconds.  Martinez Dep. 34.

Officer Mulhern was one of the last to arrive at the scene. He says he saw multiple officers trying to subdue Mr. Lewis, who was resisting.  Mulhern Dep. 19.  Thinking that the officers' efforts were being overcome, Officer Mulhern put his foot on Mr. Lewis' right shoulder and pushed, holding onto the stairwell to gain additional leverage.  Id. 23.  Officer Mulhern, who weighed approximately 280 pounds, estimates that he applied pressure for

fifteen to thirty seconds.  Id. 25-26.  Officer Mulhern and Officer Farro then attempted to pull Mr. Lewis' right arm behind him, but were unable to get into pain compliance positioning because of the strength with which Mr. Lewis resisted.  Id. 31.  Officer Mulhern intended to assist his fellow officers in subduing a subject he considered physically combative.  Id. 33.  He explained that the incident "occurred in seconds, not long drawn out."  Id. 37.  He never suspected that Mr. Lewis could have been in the midst of a medical emergency, although he thought a psychiatric emergency was possible.  Id. 44.

Toward the end of the struggle, the officers managed to handcuff Mr. Lewis by forcibly pulling his arms together.  Farro Dep. 73.  Officer Mulhern called on the radio for a "WRAP," a restraint device that wraps around a person's legs to keep them from moving, which was applied using a leg restraint called "figure four."  Id. 74-75, 77; Mulhern Dep. 43.  The WRAP was brought by Sergeant Keener and Officer Bryan, and Officer Waybright arrived separately shortly afterwards.  Waybright Dep. 19.  Officer Nguyen held on to Mr. Lewis' right leg, pressing down on it, while Mr. Lewis kicked and resisted.  Nguyen Dep. 49, 51.  At Officer Mulhern's request, Officer Waybright grabbed Mr. Lewis by the right arm and moved him somewhat; Mr. Lewis did not resist this movement.  Waybright Dep. 23.  Officer Waybright took what he considered a light pulse, and told the other officers.  Waybright Dep. 24.  Officer Mulhern assisted Officer Hutchinson in pushing Mr. Lewis' leg up for the figure four.  Mulhern Dep. 41.  While doing so, Officer Mulhern heard a pop, which he thinks could have been caused

either by twisting Mr. Lewis' foot or the force applied in moving the foot toward the buttocks.  Id. 42.

Mr. Lewis' resistence lessened once the WRAP was applied. Farro Dep. 82.  Officer Mulhern says that Mr. Lewis no longer displayed "physical combative resistence," and that his head slumped downward.  Mulhern Dep. 59-60.  Officer Waybright rolled him over; Mr. Lewis was no longer making noise.  Waybright Dep. 25-26.  At this point, Officer Farro, Officer Nguyen and Officer Waybright could see Mr. Lewis breathing.  Farro Dep. 81; Nguyen Dep. 54; Waybright Dep. 27.  Officer Olsen checked Mr. Lewis' vital signs several times and found he had a pulse and was breathing. Olsen Dep. 46-53; Farro Dep. 84-85.  Sergeant Keener noticed a little bit of blood around Mr. Lewis' mouth.  Keener Dep. 23.

Jeremy Rose, a guest at the Motel 6 and witness to the incident, viewed most of the incident and recalls it somewhat differently.  He first testified that he heard a knocking sound on a nearby door and looked out the window to see "a Black guy" who he assumed had been "taken out of his room" by police officers because the man was wearing only boxer shorts.  Hom Decl., Ex. I, Rose Dep. 15-17.  Mr. Rose saw Mr. Lewis obey a command to get on his knees, but fail to put his hands behind his head as instructed by the police, after which an officer hit Mr. Lewis' forehead with a nightstick.[3]  Rose Dep. 19-21.  Blood got "all over" Mr. Rose's door.  Rose Dep. 31.  Then four officers "jumped on him and was [sic] trying -- they were wrestling with him trying to get him to

---

[3]No officer admits to hitting Mr. Lewis on the forehead with a baton.

7

United States District Court

For the Northern District of California

still put his arms . . . behind his head."  Rose Dep. 23.  Although the officers then blocked Mr. Rose's view of Mr. Lewis, Mr. Rose says there was a struggle, in which the participants somehow moved over to the stairs, with the officers still trying to put handcuffs on Mr. Lewis.  Rose Dep. 24.  Mr. Rose continued,

> [O]nce he got dragged to the, the stair area . . . they were stepping on him; they were kicking him.  And one, one officer, I do not remember which one, stepped on his neck.

Rose Dep. 25.  Mr. Rose never saw Mr. Lewis lash out with his arm or strike any officer.  Rose Dep. 25.  He explained that officers held Mr. Lewis on his legs, two on his body, and "one guy had his foot on his neck and the other guy was handcuffing him."[4]  Rose Dep. 28.  As he was being held down, Mr. Lewis bucked upward twice.  Rose Dep. 28-29.  Afterward, the Mr. Lewis suddenly stopped moving and the officers "just let [Mr. Lewis] lay there for about two minutes."  Rose Dep. 30-31.

According to the Hayward Police Report, Mr. Lewis "became unresponsive shortly after he was handcuffed and his lower extremities place in a WRAP."  Burris Decl., Ex. F, HPD Report No. 2002-34459 (hereinafter HPD Report) at 18.  Emergency personnel arrived shortly thereafter.  Officer Bryan noticed at that time that Mr. Lewis appeared not to be breathing.  Bryan Dep. 19.  Contrary to Mr. Rose's testimony and the HPD Report, the medical records indicate that Mr. Lewis was "still fighting restraints" when placed on a C-spine.  Hom Decl., Ex. J, St. Rose Medical

---

[4]No officer admits to stepping on Mr. Lewis' neck, although Officer Mulhern testified that he placed all his weight on Mr. Lewis' shoulder and Officer Martinez testified that he stepped on Mr. Lewis' back.

Records 8.   He arrived at St. Rose Hospital in Hayward without a heartbeat and with CPR in progress.   Id.   He was pronounced dead at 6:07 a.m.   Id. at 17.

The officers who struggled with Mr. Lewis reported various injuries as a result of the encounter, including stiffness, soreness, back, arm and finger pain and minor abrasions.   HPD Report at 19.

II.   Selected Medical and Expert Evidence

Dr. Thomas Rogers of the Alameda County Sheriff's Office performed an autopsy on November 28, 2002.   Hom Decl., Ex. L, Alameda County Coroner's Report.   Dr. Rogers diagnosed rib fractures, pulmonary contusions and mild cardiomegaly (i.e. enlargement of the heart).   Rogers Autopsy 1.   He found blood on Mr. Lewis' forehead and nose and on the right side of his face, on his right upper arm, and in small amounts on many other parts of the body, including on his arm, associated with needle puncture marks.   In all, Dr. Rogers catalogued approximately sixty blunt injuries to the body.   He found that Mr. Lewis' blood contained 327 nanograms per milliliter (ng/ml) of PCP and 84 ng/ml of a cocaine metabolite.   He diagnosed the cause of death to be acute PCP intoxication.

Plaintiffs' forensic expert Dr. John Cooper performed a secondary autopsy on December 6, 2002.   Dr. Cooper found Mr. Lewis "negative for fatal pathology," meaning that "there's no identifiable cause of death that you can definitively point to and say this is anatomically the cause of death."   Cooper Dep. 66.   Dr. Cooper diagnosed rib fractures, pulmonary contusion, multiple

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

contusions and abrasions of the head, neck, torso and extremities, mild cardiomegaly.  Hom Decl., Ex. O, Cooper Autopsy 1.  He found 0.04 milligrams per liter (mg/l) of PCP, 0.04 mg/l of cocaine and 0.09 mg/l of cocaine metabolite.[5]  Although noting that the Alameda County Report contained an "impressively meticulous description" of Mr. Lewis' injuries, he critized Dr. Rogers' diagnosis of death caused by acute PCP intoxication:

> This conclusion is inconsistent with the circumstantial facts outlined in the Coroner Investigator's Report, which states that the victim was discovered to be unresponsive while being restrained by a number of law enforcement officers. . . . The amount of autopsy evidence of blunt force trauma is significantly greater than is seen in the typical in-custody death.  Even more significant as to cause of death: the drug (PCP) levels are not in the lethal range, where as the death of an agitated individual with a mildly enlarged heart, under the influence of drugs, while in the process of being restrained by overzealous police officers, is a classic history indicative of restraint asphyxia.

Cooper Autopsy at 7.  He opined that because the Alameda County Coroner's Report did not consider restraint asphyxia as a possible cause of death, its diagnosis of the cause of death could not "be regarded as objective or taken seriously as a product of impartial investigation."  Id.

At his deposition, Dr. Cooper explained that his theory that Mr. Lewis may have died from restraint asphyxia is based on the broken ribs and the pattern of contusions and abrasions, proving that "compressive force" pressed him down.  Cooper Dep. 78.  He opines,

> It's commonly understood that when a person is restricted in a

---

[5]These levels are similar to those found in the Alameda County Coronor's Report, and Plaintiffs do not dispute the presence of PCP and cocaine metabolite in Mr. Lewis' system.

**United States District Court**
For the Northern District of California

situation of mechanical asphyxia to where they can't breathe, their oxygen tension drops, and it's also understood that when his oxygen demand goes up and oxygen supply goes down that the heart becomes very, very susceptible to arrhythmias.

Cooper Dep. 91.

Dr. S. Franklin Sher, a forensic toxicologist, disputes the Alameda County Coroner's conclusion that Mr. Lewis died of an overdose of PCP. He opines that the "only scientifically proved cause of death associated with PCP intoxicated patients is rhabdomyolysis and kidney failure," neither of which was found at the autopsy. Hom Decl., Ex. V, Sher Report at 10. In his handwritten rebuttal report, Dr. Sher also disagrees with the opinion advanced by Defendants' expert Dr. Thomas Neuman that Mr. Lewis died from "excited delirium" syndrome. He opines that there was not enough cocaine in Mr. Lewis' system to cause sudden death, and that PCP-induced sudden death is very rare. Burris Decl., Ex. O, Sher Rebuttal Rep. at 4.

Dr. Charles Wetli, an expert clinical pathologist who reviewed the deposition transcripts and medical records on behalf of Defendants, concluded that Mr. Lewis lost vital signs "[m]oments after the WRAP was applied." Wetli Decl., Wetli Rule 26 Report at 2.

Mr. Roger A. Clark, Plaintiffs' police practices expert, characterizes the officers' treatment of Mr. Lewis as excessively forceful and incompetent, and states that Officers Farro, Martinez, Nguyen, Olson, Hutchinson, Sappington and Mulhern all acted "contrary to the proper arrest and control methods required in this case." Burris Decl., Ex. P, Clark Rep. at 1. He explains that in

**United States District Court**

For the Northern District of California

the case of a potential misdemeanor crime such this, there is a "well-defined limit" as to how much force should be used, and that if "the person is getting away from you, you let him get away from you, clearly."  Burris Decl., Ex. Q., Clark Dep. 134:13-16.

III.  Training

The officers state generally that they have been trained in the use of force and in the recognition of PCP and other drug influences, but that they have not received specific training in how to approach, subdue or use force against suspects who appear to be under the influence of PCP.  For instance, Officer Farro, who has been in law enforcement for nineteen years, reports that his "use of force" training was "for all situations," and that he "didn't specifically get training that says this is the way you use force when someone is under the influence."  Farro Dep. 13-14, 19. Officer Mulhern states that he has received training with respect to individuals who may be under the influence of PCP, but not specifically in the use of force against individuals under the influence of PCP.  Sergeant Keener has had prior experience but no specific training with suspects who are not communicative.  Keener Dep. 10.

Mr. Clark's opinions about the training provided by HPD are not clear.  On one hand, he states that the officers, "by virtue of POST standards and training and their individual and collective experience, knew better" than to treat Mr. Lewis as they did. Clark Rep. 1.  On the other hand, he also says that he found "no adequate POST certified training by the Hayward Police Department to its officers regarding the proper tactics and procedures in

dealing with mentally or chemically impaired, delusional, and emotionally distraught individuals." <u>Id.</u> at 2.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. <u>Nissan Fire & Marine Ins.</u>

13

United States District Court
For the Northern District of California

Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Id.

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105 (citing Adickes, 298 U.S. at 158). If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of

14

United States District Court

For the Northern District of California

production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial. <u>Id.</u> at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a <u>prima facie</u> showing in support of its position on that issue. <u>UA Local 343 v. Nor-Cal Plumbing, Inc.</u>, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. <u>Id.</u>; <u>see also Int'l Shortstop, Inc. v. Rally's, Inc.</u>, 939 F.2d 1257, 1264-65 (5th Cir. 1991). Once it has done so, the non-moving party must set forth specific facts controverting the moving party's <u>prima facie</u> case. <u>UA Local 343</u>, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." <u>Id.</u> This standard does not change merely because resolution of the relevant issue is "highly fact specific." <u>Id.</u>

DISCUSSION

I. Defendants' Motion to Exclude

Defendants move to exclude the testimony of the following expert witnesses: (1) Dr. Cooper, on the grounds that his theory of restraint asphyxia is based on junk science and thus fails to meet Federal Rule of Evidence 702's reliability requirements, <u>see Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592-3 (1993); (2) Dr. Franklin Sher, on the grounds that he is unqualified, that his Rule 26 report was not timely served and that his deposition

United States District Court

For the Northern District of California

testimony exceeded the scope of his report; (3) Dr. Ron O'Halloran, on the grounds that he failed to serve any Rule 26 report; and (4) Mr. Clark, on the grounds that he rendered medical opinions during his deposition which he was unqualified to give.

A.   Dr. Cooper

Defendants argue that Dr. Cooper's report should be excluded because it relied on the theory of "restraint asphyxia," as set forth in a 1988 study by Dr. D.T. Reay and later disproved by Defendants' expert Dr. Tom Neuman, among others.  Dr. Reay initially claimed that the "hog-tie" position could cause a person who had engaged in exercise to die from restraint asphyxia; this "positional asphyxia" theory was refuted by studies of Dr. Neuman, and later disclaimed by Dr. Reay.  See Price v. San Diego, 990 F. Supp. 1230 (S.D. Cal. 1998) (finding hog-tie position to be "physiologically neutral" based on Dr. Neuman's testimony and Dr. Reay's concession of the fact).  However, Defendants' argument attacks a strawman; Dr. Cooper does not purport to rely on Dr. Reay's theory of positional asphyxia.  Dr. Cooper concurs that "the state of being prone and with his hands being restrained . . . generally it's not felt that that in itself is enough to compromise a person's respiration enough to kill them."  Cooper Dep. 104.  For this reason, the Court denies Defendants' motion to exclude Dr. Cooper's expert report and testimony as based on "junk science."

Defendants also argue that Dr. Cooper is unqualified to testify that Mr. Lewis died of restraint asphyxia because Dr. Cooper is not an expert in respiratory physiology, and is not familiar with the terminology used in Dr. Neuman's recent studies.

16

1  However, Defendants have not shown that this level of
2  specialization is necessary in order to render his opinion that
3  pressure applied to Mr. Lewis' back could have caused a fatal
4  arrhythmia.  Defendants' argument goes to the weight, rather than
5  the admissibility, of Dr. Cooper's evidence.  Therefore, the Court
6  denies Defendants' motion to exclude his testimony.

7       B.   Dr. Sher

8       Defendants argue that Dr. Sher's testimony and report should
9  be excluded because the report was served five days after the
10  deadline for disclosure of expert reports, and because his
11  testimony exceeded the scope of his report.  Plaintiffs offer no
12  explanation for the belated filing of Dr. Sher's report.  However,
13  because Defendants show no prejudice as a result, the Court will
14  not exclude the report on that ground.

15      Dr. Sher's testimony regarding restraint asphyxiation and
16  excited delirium was disclosed in his handwritten rebuttal report.
17  Dr. Sher relies for his opinion that Mr. Lewis did not die from
18  drug-induced excited delirium on a comparison of the results of the
19  death investigation with a reference work by well-known expert Dr.
20  Karch.  Sher Dep. 138-140.  Defendants offer no reason to exclude
21  this opinion testimony by Dr. Sher, who is a forensic toxicologist
22  and has experience testing blood for drugs and alcohol.  Hom Decl.,
23  Ex. V, Sher Report, CV.  However, Plaintiffs offer no justification
24  for admitting Dr. Sher's opinions regarding restraint asphyxiation,
25  and his testimony on that subject adds nothing to Dr. Cooper's
26  opinions.  Therefore, the Court declines to consider Dr. Sher's
27  opinion that Mr. Lewis died of restraint asphyxiation, and will

28

United States District Court

For the Northern District of California

1    exclude such opinions at trial.

2        C.   Dr. O'Halloran

3        Defendants argue that Dr. O'Halloran failed to produce an

4    expert report as required by Federal Rule of Civil Procedure 26,

5    and that his testimony should be excluded.  This motion appears to

6    be moot, because Plaintiffs do not rely on Dr. O'Halloran's

7    opinions in opposing Defendants' motion for summary judgment.

8    Defendants may move to exclude Dr. O'Halloran's testimony if

9    Plaintiffs seek to call him at trial.

10       D.   Mr. Clark

11       Defendants argue that portions of Mr. Clark's testimony should

12   be excluded because they involve medical opinion testimony, which

13   he, as a police expert, is not qualified to give.  Defendants fail

14   to identify which specific portions of Mr. Clark's deposition they

15   consider to be impermissible medical opinion evidence.  The Court

16   considers Mr. Clark's opinions only as they relate to his area of

17   expertise, police practices, and not to the ultimate cause of Mr.

18   Lewis' death.  Mr. Clark's testimony at trial will be limited to

19   his area of expertise.

20   II.  Probable Cause and Conspiracy

21       Defendants move for summary adjudication that the officers had

22   probable cause, required by the Fourth Amendment, to detain or

23   arrest Mr. Lewis, based on the evidence that he was under the

24   influence of drugs and that he resisted the officers' attempts to

25   investigate his situation.  Defendants also assert that there is no

26   evidence that the officers conspired to deprive Mr. Lewis of his

27   constitutional rights.  Plaintiffs do not oppose Defendants' motion

28                                      18

**United States District Court**
For the Northern District of California

with respect to these issues.    Therefore, the Court grants
Defendants' motion with respect to the issues of probable cause and
conspiracy.

III.    Excessive Force

    Defendants move for summary adjudication that the officers
used reasonable force to detain Mr. Lewis.    Plaintiffs oppose this
aspect of Defendants' motion.

    Claims of excessive force which arise in the context of an
arrest or investigatory stop are analyzed under the Fourth
Amendment reasonableness standard.    <u>Graham v. Connor</u>, 490 U.S. 386,
395 (1989).    While unreasonable force claims are generally
questions of fact for the jury, <u>Hervey v. Estes</u>, 65 F.3d 784, 791
(9th Cir. 1995), such claims may be decided as a matter of law if
the district court concludes, after resolving all factual disputes
in favor of the plaintiff, that the officer's use of force was
objectively reasonable under the circumstances.    <u>Scott v. Henrich</u>,
39 F.3d 912, 915 (9th Cir. 1994).    However, summary judgment
"should be granted sparingly" because the inquiry "nearly always
requires a jury to sift through disputed factual contentions, and
to draw inferences therefrom."    <u>Santos v. Gates</u>, 287 F.3d 846, 853
(9th Cir. 2002).

    The question in such a determination is "whether the officers'
actions are 'objectively reasonable' in light of the facts and
circumstances confronting them, without regard to their underlying
intent or motivation."    <u>Graham</u>, 490 U.S. at 397.    Determining
whether use of force is reasonable "requires a careful balancing of
'the nature and quality of the intrusion on the individual's Fourth

19

Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting in part United States v. Place, 462 U.S. 696, 703 (1983)). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. The calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 396-97.

Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The most important element is "whether the suspect poses an immediate threat to the safety of the officers or others." Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005) (quoting Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994)). A fact-finder may also consider "the availability of alternative methods of capturing or subduing a suspect." Id. at 703 (citing Chew, 27 F.3d at 1441 n.5).

Here, conflicts between the testimony of Mr. Rose[6] and the officers create a dispute of fact regarding whether an officer hit Mr. Lewis on the forehead, spattering blood, and whether an officer stood on Mr. Lewis' neck. In addition, it is undisputed that Officer Mulhern, a 280 pound man, placed his foot on Mr. Lewis'

_____

[6]Defendants make repeated reference to Mr. Rose's criminal history; Mr. Rose's credibility is a matter for a jury, not the Court, to determine.

United States District Court

For the Northern District of California

back for up to thirty seconds while pushing on the staircase for additional leverage.   The fact that Dr. Cooper found a "negative pathology" associated with Mr. Lewis' physical injuries shows that it is undisputed that Mr. Lewis did not die as a direct result of being crushed by Officer Mulhern or beaten by the other officers. Nevertheless, according to Plaintiffs' police practices expert, these acts by Officer Mulhern and an unknown officer could be considered the use of deadly force.   Clark Dep. 134.   See Smith, 394 F.3d at 706 (defining deadly force as that which "creates a substantial risk of causing death or substantial bodily injury"). For the reasons described in Section I(A) above, Dr. Cooper's opinion that Mr. Lewis likely died from restraint asphyxiation is not based on Dr. Reay's discredited theory of positional asphyxiation, and therefore is admissible medical opinion testimony.   In fact, the total weight applied by the 280 pound Officer Mulhern as he used the stairway for leverage exceeds even the level which Defendants' own expert, Dr. Neuman, opines is clinically safe.   See Neuman Decl. ¶ 16 (citing his own study showing that placement of 225 pounds of weight does not "cause clinically important effects upon blood oxygenation").   Therefore, Plaintiffs have raised a dispute of fact as to whether the officers used deadly force as they restrained Mr. Lewis.

Conflicts between Mr. Rose's testimony and that of the officers also raise a dispute of fact regarding the extent of the governmental interest at stake.   Mr. Rose says that Mr. Lewis did not lash out with his arms, and only bucked twice before going limp on the ground.   Even the officers' own testimony describes only one

21

United States District Court

For the Northern District of California

act of aggression by Mr. Lewis that was not in response to their own attempts physically to subdue him, namely when Mr. Lewis aggressively lunged from ten feet away and said, "It's on." Yet Officer Olsen also testified that, as he walked, Mr. Lewis seemed unsteady, belying the claim that Mr. Lewis posed a threat of serious harm as he advanced. Defendants claim that Mr. Lewis posed a threat to other Motel 6 guests and to nearby commercial businesses, but only attorney argument supports this theory. Mr. Clark testified that the officers should have abandoned their attempts to arrest Mr. Lewis rather than persisting in their "pain compliance" efforts. In sum, there are disputes of material fact regarding the degree of force used; whether Mr. Lewis in fact posed a risk to others; the extent to which Mr. Lewis resisted arrest; and the availability of alternative means to deal with the situation.

Deadly force may be constitutionally reasonable when used to prevent the escape of an unarmed suspect only where "an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Tennessee v. Garner, 471 U.S. 1, 11 (1985). The cases cited by Defendants do not support the use of deadly force in a situation such as this, where the decedent did not behave violently prior to being approached by police or security personnel, and police greatly outnumbered decedent. Cf., e.g., Unzueta v. Steele, 291 F. Supp. 2d 1230, 1238 (D. Kan. 2003) (finding application of weight allegedly causing asphyxiation to be justified where decedent initiated incident by punching another person in the face); Wagner

22

v. Bay City Texas, 227 F.3d 316 (5th Cir. 2000) (finding
application of weight allegedly causing asphyxiation to be
justified where decedent first started punching officer).

Furthermore, less than deadly force may be excessive where
there is no reason to suspect that an individual is armed or poses
an immediate threat to the safety of officers or others.  In Smith,
the Ninth Circuit overruled a grant of summary judgment in favor of
defendant officers where the plaintiff had resisted arrest but was
not "particularly bellicose," had no weapon and did not attempt to
flee.  394 F.3d at 703.  The Ninth Circuit concluded,

> given the circumstances, the totality of force used--four
> blasts of pepper spray, slamming Smith down onto the porch,
> dragging him off the porch face down, ordering the canine to
> attack him three times, and the resultant dog bites and
> physical assaults on his body--was unreasonable.

Id. at 703-704.  Similarly, here, if all disputes of fact are
resolved and all inferences drawn in Plaintiffs' favor, the
totality of force used was unreasonable given Mr. Lewis' unarmed
and incapacitated state.  In a case such as this, where there are
competing factual contentions and inferences to be drawn, summary
judgment would be inappropriate.

Defendants in particular ask that Plaintiffs' claims against
Officers Waybright and Bryan be dismissed, because these officers
participated only in the application of the WRAP.  Plaintiffs' own
expert, Mr. Clark, does not list Officers Waybright and Bryan among
those who had direct involvement in the incident.  Clark Rep. 1.
In addition, at the hearing, counsel represented that Plaintiffs
were not pursuing an individual claim against Sgt. Keener, who also
arrived later at the scene.  Accordingly, the Court grants

23

United States District Court

For the Northern District of California

1    Defendants' motion with respect to Officers Waybright and Bryan and

2    Sgt. Keener.

3        Otherwise, the Court denies Defendants' motion for summary

4    adjudication that Mr. Lewis' rights were not violated by the use of

5    excessive force.

6    IV.  Qualified Immunity

7        Defendants move for summary adjudication that they are

8    protected by qualified immunity.

9        The defense of qualified immunity protects government

10   officials "from liability for civil damages insofar as their

11   conduct does not violate clearly established statutory or

12   constitutional rights of which a reasonable person would have

13   known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The

14   threshold question is whether, taken in the light most favorable to

15   the plaintiff, the facts alleged show that the officer's conduct

16   violated a constitutional right.  Saucier v. Katz, 533 U.S. 194,

17   201 (2001).  The plaintiff bears the burden of proving the

18   existence of a clearly established right at the time of the

19   allegedly impermissible conduct.  Maraziti v. First Interstate

20   Bank, 953 F.2d 520, 523 (9th Cir. 1992).  If the law is determined

21   to be clearly established, the next inquiry is whether a reasonable

22   official could have believed his conduct was lawful.  Act

23   Up!/Portland v. Bagley, 988 F.2d 868, 871-72 (9th Cir. 1993).  The

24   defendant bears the burden of establishing that his or her actions

25   were reasonable, Doe v. Petaluma City Sch. Dist., 54 F.3d 1447,

26   1450 (9th Cir. 1995), and the defendant's good faith or subjective

27   belief in the legality of his or her actions is irrelevant.  Alford

28                                  24

**United States District Court**

For the Northern District of California

1  v. Haner, 333 F.3d 972, 978-79 (9th Cir. 2003).  Where there are

2  genuine issues of fact relating to what the officer knew or did, or

3  if a reasonable juror could find that the officer acted

4  unreasonably, the question is appropriately for the trier of fact.

5  Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095,

6  1099-1100 (9th Cir. 1995).

7      Plaintiffs cite clearly established law that deadly force may

8  not be used unless it is necessary to prevent escape and the police

9  officers have probable cause to believe that the suspect poses a

10 significant threat of serious physical injury to them or others.

11 Garner, 471 U.S. at 11.  For the reasons described above, whether

12 or not the officers used excessive force; whether the officers used

13 deadly force; and the extent of the governmental interest in

14 subduing Mr. Lewis are all disputed issues of fact.  Therefore, the

15 Court denies Defendants' request for summary adjudication that they

16 are entitled to qualified immunity.

17 V.  Municipal Liability

18     Defendants move for summary adjudication of Plaintiffs' second

19 § 1983 claim based on HPD's alleged failure to train the officers.

20 Plaintiffs oppose this portion of Defendants' motion.

21     To prevail on a § 1983 claim against a municipality, a

22 plaintiff must show: (1) that he or she suffered a deprivation of a

23 constitutionally protected interest; and (2) that the deprivation

24 was caused by an official policy, custom or usage of the

25 municipality.  Monell v. New York Dep't of Social Services, 436

26 U.S. 658, 690-91 (1978); see also City of Canton v. Harris, 489

27 U.S. 378, 390-91 (1989).  Municipal liability based on

28

**United States District Court**

For the Northern District of California

unconstitutional acts of municipal employees cannot be established on the basis of respondeat superior, but rather requires proof that the harm was caused by the policy or custom of the municipality. Monell, 436 U.S. at 694. While the liability of municipalities does not depend upon the liability of individual officers, it is contingent on a violation of constitutional rights. Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994), cert. denied, 515 U.S. 1159 (1995).

The inadequacy of police training can form the basis for municipal liability "only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." City of Canton, 489 U.S. at 388. Such circumstances arise when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390. Accordingly, it will not suffice "to prove that an injury or accident could have been avoided if an officer had [received] better or more training, sufficient to equip him to avoid the particular injury-causing conduct." Id. at 391.

Whether a local government entity has displayed a policy of deliberate indifference is generally a question of fact for the jury. Oviatt v. Pearce, 954 F.2d 1470, 1478 (9th Cir. 1992); Wood v. Ostrander, 879 F.2d 583, 588 n.4 (9th Cir. 1989), cert. denied, 498 U.S. 938 (1990). However, if a plaintiff fails to introduce

United States District Court

For the Northern District of California

evidence from which a jury could infer deliberate indifference, the case may be resolved summarily.  See, e.g., Mateyko v. Felix, 924 F.2d 824, 826 (9th Cir.), cert. denied, 502 U.S. 814 (1991) (testimony that officers received only three to four hours of Taser gun training and lacked information as to the Taser's precise effect would at best support a finding of mere negligence); Merritt v. County of Los Angeles, 875 F.2d 765, 771, 771 n.10 (9th Cir. 1989) (no evidence presented that county was aware of need to train officers regarding import of conflicting VIN numbers).  In comparison, cases that have survived defense motions for summary disposition have involved training programs that were far below national standards, Reed v. Hoy, 909 F.2d 324, 331 (9th Cir. 1989), cert. denied, 501 U.S. 1250 (1991), or virtually nonexistent, Davis v. Mason County, 927 F.2d 1473, 1482-83 (9th Cir.), cert. denied, 502 U.S. 899 (1991) (judgment for plaintiff as a matter of law).

     In their brief, Plaintiffs fail to identify facts that could lead a jury to conclude that the City of Hayward was deliberately indifferent to Mr. Lewis' constitutional rights.  Mr. Clark's expert report does not clearly state that the officers' training was inadequate; indeed, he suggests that the officers should have known, based on their training, that their use of force was excessive.  This evidence is not sufficient to allow a jury reasonably to conclude that HPD policymakers were deliberately indifferent to the need for additional training.  Therefore, the Court grants Defendants' motion for summary adjudication of Plaintiffs' Monell claim.

United States District Court

For the Northern District of California

## VI.   Standing and Damages

As a result of this order and Plaintiffs' earlier stipulated dismissal of all State law causes of action, the only claims remaining for trial are (1) Plaintiffs Demario, Delorenzo and Deandre Lewis' § 1983 claim against the officers (other than Officers Waybright and Bryan and Sgt. Keener) for deprivation of Mr. Lewis' constitutional rights; (2) Demario, Delorenzo and Deandre Lewis' § 1983 claim against the officers (other than Officers Waybright and Bryan and Sgt. Keener) for depriving, without due process of law, the Lewis children of their "right to familial relationship"; and (3) Plaintiff Annie Lewis' § 1983 claim, brought as a survival action for deprivation of Mr. Lewis' constitutional rights.  Because no State law claim for wrongful death remains in the case, Plaintiffs' contentions in their supplemental briefing regarding recovery for such claims are inapposite.

### A.   Standing

"Fourth Amendment rights are personal rights which . . . may not vicariously be asserted." Alderman v. United States, 394 U.S. 165, 174 (1969).  Accordingly, the general rule is that only the person whose Fourth Amendment rights were violated can sue to vindicate those rights. Smith v. City of Fontana, 818 F.2d 1411, 1417 (9th Cir. 1987), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999).  Under § 1983, however, survival actions are permitted in excessive force cases if authorized by State law.  42 U.S.C. § 1988(a); Smith, 818 F.2d at 1416.  The party seeking to bring a survival action bears the

burden of demonstrating that State law authorizes the survival action and that it meets the State's requirements. See Byrd v. Guess, 137 F.3d 1126, 1131 (9th Cir. 1998), abrogation on other grounds recognized by Moreland v. Las Vegas Metro. Police, 159 F.3d 365, 369-70 (9th Cir. 1998).

Under California's survival statute "a cause of action for or against a person is not lost by reason of the person's death," whether the loss or damage occurs simultaneously with or after the death. Cal. Civ. Proc. Code § 377.20(a), (b). Such action passes to the successor-in-interest and may be commenced by the decedent's successor-in-interest or, if none, by the decedent's personal representative. Cal. Civ. Proc. Code § 377.30. The "decedent's successor in interest" is defined as "the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action." Cal. Civ. Proc. Code §§ 377.11, 377.30.

If, as Plaintiffs allege, Mr. Lewis did not leave a will, his children, but not his mother Annie Lewis, would be entitled to bring survival claims as successors-in-interest under California's laws of intestate succession. See Cal. Prob. Code § 6402(a) (if decedent leaves children, the estate goes to the children and the surviving spouse, if there was one, or entirely to the children, if there was no surviving spouse); cf. id. at § 6402(b) (only if there are no surviving children are the decedent's parents entitled to inherit).

In their motion for summary judgment, and again in their

29

supplemental briefing, Defendants argue that Plaintiffs have failed to meet their burden to show that they have standing to pursue claims, on the grounds that Mr. Lewis had no legal heirs.  However, the undisputed fact that Demario, Delorenzo and Deandre Lewis are surviving children of Mr. Lewis establishes as a <u>prima facie</u> matter that they are successors-in-interest and thus appropriate plaintiffs to bring a survival action under California law.  Thus, the Court denies Defendants' motion for summary adjudication that Plaintiffs lack standing to bring survival claims on behalf of Mr. Lewis.

    B.   Scope of Recovery

        1.   Survival Action

    California law provides that the damages recoverable by a decedent's personal representative or successor-in-interest are "limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."  Cal. Civ. P. Code § 377.34.  Although there is no controlling federal authority on point, the California Supreme Court has found that California's law limiting recovery of personal damages for pain and suffering is consistent with federal law and thus applies to § 1983 actions.  <u>County of Los Angeles v. Superior Court</u>, 21 Cal. 4th 292, 303-307 (1999); <u>see also</u> <u>Venerable v. City of Sacramento</u>, 185 F. Supp. 2d 1128, 1133 (E.D. Cal. 2002) (noting absence of controlling federal law and applying California law to prevent recovery of pain and suffering

United States District Court

For the Northern District of California

in § 1983 survivor action).  Plaintiffs concede that Mr. Lewis'
damages for pain and suffering are not recoverable.  Therefore, if
the jury were to find that Defendants used excessive force but did
not cause Mr. Lewis' death, Plaintiffs' recovery would be limited
to any loss or damage sustained prior to death, not including pain,
suffering or disfigurement, and any punitive damages.

                    2.   Loss of Familial Relationship

        If the jury were to find that Defendants caused Mr. Lewis'
death, Plaintiffs might be able to recover based on their loss of
familial relationship.  The Fourteenth Amendment protects familial
relationships from unwarranted State interference.  See Smith, 818
F.2d at 1418.  Where State action resulting in the unlawful death
of a family member is alleged, surviving family members may bring a
claim under § 1983 for violation of their substantive due process
right to the companionship and society of the decedent.  See id. at
1419 (State has no legitimate interest in interfering with
children's protected liberty interest in familial relationship with
father through use of excessive force by police officers); see also
Moreland, 159 F.3d at 371 (substantive due process claim may be
asserted by both the parents and children of a person killed by law
enforcement officers).

        In their supplemental reply brief, Defendants argue for the
first time that they are entitled to summary judgment on the issue
of damages for loss of companionship, apparently on the grounds
that Plaintiffs have failed to introduce any evidence that Mr.
Lewis financially supported them.  However, Defendants cite no case
law suggesting that plaintiffs can recover for loss of familial

**United States District Court**
For the Northern District of California

1  relationship only if they were financially dependent on the

2  decedent, and the fact that parents may recover for the death of a

3  minor child suggests that no such requirement exists.

CONCLUSION

5      For foregoing reasons, the Court GRANTS in part Defendants'

6  motion for summary judgment and DENIES it in part (Docket No. 57).

7  Specifically, the Court grants Defendants' motion with respect to

8  the issues of probable cause and conspiracy; all claims against

9  Officers Waybright and Bryan and Sgt. Keener; and the <u>Monell</u> claim.

10 The Court denies Defendants' motion with respect to the issues of

11 excessive force and qualified immunity.

12     The Court GRANTS Defendants' motion to exclude Mr. Clark's

13 medical opinion testimony, but otherwise DENIES the motion to

14 exclude (Docket No. 69).

15

16     IT IS SO ORDERED.

17

18 Dated:    2/21/06



CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California